DeCARLO, Judge.
Manslaughter first degree; ten years. On October 17, 1975, the grand jury of Madison County indicted Arthur M. Hum-phries for first degree murder. The indictment alleged that the appellant:
“. . . unlawfully killed Joann E. Sloan, by perpetrating an act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life by, to-wit: operating a motor vehicle while under the influence of intoxicating liquors or narcotic drugs along a highway and while operating the said motor vehicle under the influence of intoxicating liquors or narcotic drugs did run the motor vehicle in which the said Arthur M. Humpries was driving over, upon, into or aginst the motor vehicle in which the said Joann E. Sloan was driving and as a proximate cause thereof, unlawfully killed the said Joann E. Sloan.”
When the trial began on March 1, 1976, the appellant made a motion to dismiss or for a continuance of the trial, based on an article appearing in that morning’s Huntsville newspaper. The article contained a synopsis of the circumstances surrounding the collision and quoted the district attorney as saying: “ ‘Eventually I’ll find 12 people who will convict for murder in the first degree in Madison County.’ ” In sup *46 port of this motion, the only evidence offered was the newspaper article.
After a jury was chosen, the State presented the following evidence.
On October 5, 1975, Joann Sloan left her apartment about 3:30 P.M. and drove her Volkswagen automobile to the intersection of Memorial Parkway, South, and Logan Drive in Huntsville, Alabama. It was about 4:00 P.M., when she entered the intersection and a car driven by the appellant collided with her car and she was killed.
Approximately the same time, John Walters was driving a Vega automobile east on Logan Drive. He testified that he had stopped at the light and was waiting for the light to change when he looked to his left and saw a girl in a Volkswagen. He stated these were the last things he remembered and that he did not recall the light changing, but that the only thing that he next remembered was being upside-down in his car.
Richard Saunders Jones, a captain in the United States Army, on October 5,1975 was in the vicinity of Logan Drive and Lily Flagg, where they intersect Memorial Parkway. He said that it was a few minutes after 4:00 o’clock and he was behind Sloan’s car on Logan Drive. The light changed from red to green and the car driven by Sloan and the car next to her proceeded side by side into the intersection. At that point Jones saw a Chevrolet coming down the Parkway when he stopped. A “split' second” later the collision occurred. Jones saw the Chevrolet out of the corner of his eye for a little less than two seconds before the impact. In his judgment, the Chevrolet was traveling about fifty miles per hour when it entered the intersection. Jones recalled that as the Volkswagen and the Vega entered the intersection, the Chevrolet collided with the Volkswagen in the area near the driver’s door. The collision forced the Volkswagen into the Vega which turned over on its roof. Jones stated that before the Vega came to rest on its roof in the median of the road, it turned over one and one-half revolutions.
Jones did not recall seeing the appellant’s car apply its brake or hear any “screeching or squealing of brakes.” He said that the car driven by the appellant did not slow down prior to the impact.
After the collision Jones went over to the Volkswagen to determine if the girl could be moved. He said that the door would not open and since the gas tank was ruptured, he was afraid of fire. He could not recall trying to cut the ignition off, but said that when he could not move the girl he went to give aid to the person in the Vega. It was at that time that he saw the appellant get out of his Chevrolet, shut the door, and just stand there. Jones remembered calling to the appellant but could not remember whether the appellant responded. He did not take the girl’s pulse but in his judgment she was dead. Jones testified that after the police arrived, he remained in the area because he “. . was curious whether it [the traffic light] had mal-functioned.” He said the light was working properly.
Peggy Jane Barber was in the vicinity of Logan Drive and Memorial Parkway when the collision occurred. She was on Lily Flagg going to Logan Drive and had stopped for a red light. Barber said that she . . was looking directly at the light in front of me and as it turned green she proceeded across but as she reached the median, “. . a Caprice hit the Volkswagen and Vega that was pulling out from Logan.” According .to Barber the accident occurred right in front of her eyes and she did not hear “squealing of tires” but did hear a “loud explosion” when the cars hit. She did not see -the Chevrolet coming but did see the cars in front of her. Barber explained that she was not paying any attention to the cars but “I was mostly looking at the light so I would know when to proceed on across.”
Jean Dewitt, a practical nurse at the Huntsville Nursing Home, arrived at the scene of the collision about 4:00 P.M. She observed a girl penned in a car and said that “. . . she was cyanotic and she was having Chain-Stokes respiration.” Dewitt explained that the girl would *47 breathe and then stop for ten or fifteen seconds. The motor of the deceased’s car was still running and gasoline was everywhere. Dewitt could not get the girl out, and she asked a man to “cut the engine off” and he did. She stated “. . . there was another car upside down and there was a male in it.” After she went over to the other car she returned to the Volkswagen. According to Dewitt, at that time the girl was no longer breathing.
William Dobbs was employed by the Huntsville Police Department and on October 5, he received a call to go to Logan Drive and Memorial Parkway, South. He was advised there had been a fatality. Upon arrival, he found there had been a three-car accident. He said that a 1973 Vega was upside-down in the median facing south, a 1973 Chevrolet Impala was sitting upright heading south, and a 1966 Volkswagen was in front of the Chevrolet. The officer said that the victim was still in her car and that Phil Armstrong made certain photographs, all of which were admitted by agreement during the trial. He made no measurements himself but said Officer Russo did. Dobbs said there were some skid marks but he could not determine if they were made by the 1973 Impala. He acknowledged there were marks leading from where the Volkswagen was hit to where the cars came to rest. Behind the place where the cars collided he could not find any skid marks showing where the appellant had applied his brakes. According to Dobbs, the speed limit in the area of Memorial Parkway where the collision occurred was fifty miles per hour.
The officer said the appellant, in response to questions, said that he was the driver of the car and that he had been drinking. Dobbs observed the appellant for about thirty minutes, and it was his opinion that Humphries “was very intoxicated.”
Jerry Wheeler, a policeman, testified that 4:30 or 5:00 P.M., on October 5, 1975, he carried the appellant to the Huntsville Hospital. The appellant was in Wheeler’s presence for ten or fifteen minutes but the officer did not have any conversation with him. Wheeler described the appellant as being unsteady on his feet and said his attitude appeared to be that of “total unconcern.” On reaching the hospital, Wheeler spoke with the appellant whose speech “appeared to be slurred.” The officer was present when the blood was taken from the appellant and the “vacutainer” containing it was turned over to him. Wheeler said that he marked and put his name on the “vacutainer” and then turned it over to the toxicologist.
Helen D. Bryant, a registered nurse at the Huntsville Hospital, testified that on October 5, 1975, she drew a blood sample from the appellant. Bryant said that the appellant had signed a release in her presence and that the vial containing the appellant’s blood was given to the police officer who was with him.
Martha Odom was employed as a toxicologist with the Huntsville Division of the Alabama Department of Toxicology. She testified as to her education, experience and background and said that she had been performing alcohol analyses since January of 1973. Odom stated that on October 6, 1975, she received a blood sample from a fellow worker about 8:15 that morning. According to Odom, the sample had the name “Humphries” on it and the “initials J W 334” written on the plastic bag containing it. She analyzed the specimen and found it contained 0.25 percent ethyl alcohol.
Over appellant’s objections, Odom was allowed to testify:
“A person with this level alcohol in their blood would be considered to be under the influence of an intoxicated beverage and incapable of safely operating a motor vehicle or doing any other task which would require a similar degree of skill or muscular coordination.”
She added that some of the effects that a person might experience with 0.25 percent concentration of alcohol in his blood would be:
“. . . signs of some mental confusion; there might be some slight muscular incoordination; maybe slight visual *48 defects as far as being able to see things clearly.”
On cross-examination, she acknowledged that a one hundred and sixty pound person, over a period of an hour, who had drunk seven or eight “beers” or seven or eight “miniatures of whiskey” would have 0.25 percent ethyl alcohol in his blood. Odom said that behavior is based on the amount of alcohol in contact with the brain at a particular time. She explained:
“. . . a smaller person could consume a less amount of alcohol to reach .25 than a heavier person. The time of absorption is pretty much the same, depending if they have the same amount of food in their stomach, these kind of things.”
According to Odom, the absorption rate would depend on such things as the condition of the stomach and the form in which the alcohol was consumed.
Odom testified that she made an analysis of the blood specimen taken from the deceased and found that it did not contain any ethyl alcohol.
Samuel Spry was the coroner for Madison County, and, after he was called as a witness by the appellant stipulated that the coroner “. . . did make an examination of Joanne Sloan and she was killed and the cause of death in his opinion was the automobile accident.”
Robert Stephen Russo, a police officer, drew a diagram depicting the scene of the collision and the location of the cars. The diagram and other depictions were admitted in evidence by stipulation. At the end of his testimony, the State rested its case, and out of the jury’s presence the appellant made motions to exclude the State’s evidence as to murder in the first degree, second degree and manslaughter in the first degree. When these motions were overruled the appellant took the stand in his own behalf.
Humphries, who was married and the father of two boys, was forty-one years old and employed by “D.C. & E., Constructors and Engineering Contractors.” He testified that on October 5,1975, he was driving a 1973 Chevrolet Caprice to Huntsville when he stopped at a “little Chinese place” on “north Parkway,” to eat. He said that he could not eat the food but did drink one beer. This was approximately three o’clock and upon leaving there he went to “Terry’s Pizza” which was located on the “south Parkway” about two blocks north of Logan Drive. Whilé there he drank two more “beers” and ate a pizza. He then started to his home. Humphries testified, “I was going down the Parkway between 40 and 50 and the light was green and the next thing I knowed [sic], there was a car in front of me and there was a collision and that’s all I really remember.” He stated that the light was green and that the type of car that pulled out in front of him was a Volkswagen.
Appellant said that on the day in question the only alcoholic beverages that he had consumed were five “beers.” One at the “Jade Pagoda,” two at “Terry’s Pizza,” and two at a friend’s house at approximately 11:00 that morning. Humphries said that he did not feel any strong effects of alcohol and was not unsteady on his feet. He stated that his automobile was under control and that he was driving it properly. Further, the appellant said that he could see the traffic light and that he knew that it was green. Humphries stated that at the time he saw the Volkswagen he picked up his foot, “to hit the brakes” but did not know if he had.
On cross-examination, the appellant testified that, about one-half block from where the collision occurred, he looked at his speedometer and he was driving forty-five or fifty miles per hour. He said that his vision was not blurred and when he checked his speedometer he was going forty-five miles an hour. Humphries stated that when he approached the intersection he was traveling about forty-five miles an hour and he looked up at the light and it was green. He said that he did not see the Volkswagen until right before he hit it.
The appellant explained that the reason he did not attempt to help anyone was not because he was unsteady on his feet, but *49 because “I know you ain’t supposed to move anybody when they have had an accident.”
Humphries admitted that in August, 1954, he plead guilty to burglary and grand larceny, but said he was given probation on a four-year sentence.
The appellant called seventeen character witnesses who testified that his general reputation in the community was good and that his reputation for truthfulness was also good.
Bobby Knowles, the superintendent of traffic engineering for Huntsville, stated he was in charge of traffic lights and their operation. He testified that the light at the intersection of the Parkway and Logan Drive was “. . .a free floating, fully actuated traffic signal.” Knowles explained that the traffic signal was not connected to any other and was totally independent and that “fully actuated” meant the signal worked on “total traffic demand.” He said that the amount of time it stays green depends on the amount of traffic on the street at the time. During his testimony, he explained to the jury the terms: “max-out,” “gap-out,” “peak-out,” “lock-in,” and “dilemma zone,” which were terms used in connection with traffic signals.
On cross-examination, Knowles stated there had been no report of any malfunction of a traffic signal at the intersection in question on October 5, 1975. He acknowledged that the light was working properly and that when it was checked on September 22, 1975 it was found to be working properly-
On re-cross-examination, Knowles was asked:
“Q Let me ask you one other question, this dilemma thing can be confusing. When you say dilemma time, if a person travelling on the Parkway saw a green light and never saw anything else travel-ling south, would it be possible for the people travelling in these directions also to see a green light?’
“A No sir.
“Q No way?
“A No way.”
On completion of the defendant’s case, the State called in rebuttal, Pam Pinson. She testified that on October 5, 1975, she was at the intersection of Parkway and Lily Flagg. Pinson said that she had stopped, because the light had turned red and was waiting to turn left into Lily Flagg. She testified that “. . . within a matter of seconds this car came whizzing by and the Sloan car had started across and this other car rammed into the Sloan car.” Pin-son said she did not hear any tires squealing and after the accident, the light was still red.
I
The appellant contends that the facts in the instant case are not sufficient to warrant the jury’s verdict of manslaughter in the first degree. Counsel argues:
“To constitute wanton negligence so that homicide resulting therefrom is voluntary manslaughter there must be a design, purpose, or intent to do- wrong, or reckless indifference to or disregard of the natural or probable consequences of the act done.”
What constitutes manslaughter in the first degree has been stated by this court many times. Judge Price in Gilliam v. State, 38 Ala.App. 420, 89 So.2d 584, stated:
“The principle is well recognized and has been stated many times that ‘In order to constitute manslaughter in the first degree, there must be either a positive intention to kill, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily injury may be a consequence.’ ” [Citation omitted.]
See also: Hammell v. State, 21 Ala.App. 633, 111 So. 191; Jones v. State, 33 Ala.App. 451, 34 So.2d 483; Johnson v. State, 34 Ala.App. 623, 43 So.2d 424.
In the same opinion, this court, quoting from Gurley v. State, 36 Ala.App. 606, 61 So.2d 137, 139, recognized that:
“ ‘If one drives an automobile in such a manner as to evidence a wanton and reckless disregard of human life at the *50 time and place and under the circumstances, and such driving proximately causes the death of another, the act would be manslaughter in the first degree whether the positive intention to kill is proven or not. Reynolds v. State, 24 Ala.App. 249, 134 So. 815, 816; Graham v. State, 27 Ala.App. 505, 176 So. 382; Jones v. State, 33 Ala.App. 451, 34 So.2d 483.’ ”
Under the evidence in the present case it became • a matter for the jury to determine whether the accused was guilty of manslaughter in the first degree.
As can be seen from the evidence recited above, the State showed that the appellant while drunk drove his automobile along a public highway and that the appellant’s automobile appeared to be traveling at fifty-five miles per hour at the time it struck the deceased’s car. It is uncontested that the collision was of such force that the deceased’s Volkswagen was knocked into the Vega, which was beside it in the next lane. The impact caused the Vega to rise, make one and one-half revolutions and then come to rest on its roof. It is also uncontested that appellant’s blood contained 0.25 percent alcohol, which was two and one-half times more than the legal presumption (0.10 percent of alcohol in the blood, T. 36, § 155(3), Code of Alabama 1940, Recompiled 1958, 1973 Cum.Supp. to Vol. Eight) for driving while intoxicated.
All of these facts, along with the fact that the appellant approached the intersection at a high rate of speed without stopping, were sufficient, in our judgment, to justify the jury’s verdict. Further, it was sufficient to warrant the jury’s conclusion that Humphries’ conduct was wanton and evinced a reckless disregard for human life.
The court was not in error in overruling the defendant’s motions to exclude the State’s evidence and was correct in denying the defendant’s motions for “directed verdicts.”
II
We have reviewed that portion of the record containing the motion for a dismissal or continuance due to the newspaper article and have examined the article. We note that the appellant did not present any evidence in behalf of his motion and that the actual article was not unduly prejudicial. Under the law in Alabama, it is clear that on such a motion the burden is on the defendant to show to the reasonable satisfaction of the trial court that a fair trial cannot be had or an unbiased verdict rendered because of such publicity. Godau v. State, 179 Ala. 27, 60 So. 908; Mathis v. State, 280 Ala. 16, 189 So.2d 564.
The Supreme Court of Alabama noted in Mathis v. State, supra, that publicity by press alone does not warrant a continuance and it is a matter addressed to the trial court’s discretion.
In our judgment the court’s ruling on this motion was correct.
Ill
Under T. 15, § 389, Code of Alabama 1940, Recompiled 1958, we have reviewed the record several times, and in particular, have examined the appellant’s twenty-three requested charges refused by the trial court. In our judgment, the trial court properly refused these charges. They were either incorrect statements of the law, abstract or substantially covered in the court’s extensive oral charge to the jury.
Our examination of the record did not reveal any error, and the case is due to be affirmed.
AFFIRMED.
All the Judges concur.