[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 668 
On the night of August 16, 1970, Charles Ray Lovett mysteriously disappeared from his home in Decatur. Seven years later his skeleton was found in Seminole County, Florida. The defendant was indicted and convicted for his murder and sentenced to life imprisonment. From this conviction she appeals alleging numerous errors in her trial including the insufficiency of the evidence to support her conviction.
On March 13, 1970, the defendant's husband, Glenn Dolvin, was indicted for the theft of Lovett's automobile. It is the State's theory that Lovett was kidnapped and murdered in order to prevent him from testifying in Glenn Dolvin's trial.
J.R. Garrett owned and operated a barber shop in a small shopping center located within two blocks of Lovett's residence. On the Sunday afternoon of July 25, 1970, Mr. Garrett observed Glenn Dolvin drive a Cadillac in front of the shopping center and park. He "didn't do anything but sit there". On August 3rd, or sometime during that week, Mr. Garrett saw Glenn Dolvin walking near Freemont Street. Charles Ray Lovett and his family lived in the second house on Freemont Street. Two or three days later, Mr. Garrett reported Glenn Dolvin's actions to a detective of the Decatur Police Department because he "thought there was a bank robbery in progress".
On the afternoon of August 16th, Glenn Dolvin asked service station attendant Rick Hames for directions to Freemont Street. This service station was also within two blocks of Lovett's house.
At 8:30 on the evening of Sunday, August 16, 1970, Lovett went to his next door neighbor's house to get his son. Other than the kidnappers, neighbor Sherlon Nagy was the last person to report seeing Lovett alive.
At 10:00 that night, Lovett called his wife at the Dairy Queen where she worked part-time. He asked her to bring him something to eat. At approximately 10:05 Mrs. Lovett carried out a plastic bag of trash. She noticed a Volkswagen of a "dark greenish" color parked next to her car and almost directly in front of the side door of the Dairy Queen. Although she was unable to identify the driver except for the fact that he was a male, she positively identified the defendant as the woman who was sitting in the passenger's seat. Mrs. Lovett testified that the defendant "kept staring" at her while she placed some fruit in her car and then walked to the Dempsey Dumpster. When Mrs. Lovett returned from disposing of the trash the Volkswagen was gone.
Debbie Garrett was fourteen years old and had gone to work with her mother at the Handy Way convenience store on the Sunday night of August 16th. This store was in the same small shopping center as Mr. Garrett's barber shop and is bordered on one end by Ashley Drive. Ashley Drive is parallel to and one block from Freemont Street. As Miss Garrett locked the ice machine outside the store she noticed a dark green Volkswagen sitting near the beginning of Ashley Drive. Although the Volkswagen's engine was running, its headlights were off. The defendant was the only person Miss Garrett observed in the Volkswagen.
Miss Garrett saw the defendant back the Volkswagen out of Ashley Drive, drive one block and turn in Freemont Street, then back out of Freemont and return to her original spot on Ashley. The defendant drove slowly and without lights. In a few minutes the defendant made the same trip again. Shortly after this second trip, Miss Garrett heard a "holler" of inaudible words. Then she saw the defendant back out of *Page 669 
Ashley Drive and drive into the alley which ran between Ashley Drive and Freemont Street. The defendant was driving "fast" and "in a hurry". About ten seconds later, the defendant came out of the alley and drove past the shopping center at which point the headlights of the Volkswagen came on. Driving "fast" or "moderately fast", the defendant drove one block, turned around in an intersection and drove back past Miss Garrett. At this time Miss Garrett saw two men in the front seat with the defendant. The man in the passenger's seat was sitting with his back towards the car window and was facing the defendant. The man in the middle of the front seat was sitting low in the seat but was not slumped over. Miss Garrett was unable to identify or recognize either man. During these events, she did not hear any shooting or the backfiring of an automobile.
Mrs. Betty Third lived directly across from the Lovetts on Freemont Street. At approximately 10:45 that night she "heard someone hollering, `Help, help, let me go'. And then there was a loud noise." Looking out her front window she saw a Volkswagen of a dark color "pulling slowly" in front of the Lovetts' house. She also saw a man walking between her house and her neighbors' on the neighbors' carport. She noticed a barbecue grill turned over near the Hardimans' carport. After Mrs. Third saw the automobile she assumed the "loud noise" was a backfire and did not pay much attention to anything else about the Volkswagen. When Mrs. Third went to a window facing the Hardimans' house the man was gone so Mrs. Third returned to bed. Although she did not recognize the man she testified that the stranger was not Mr. Lovett.
Henry David Hardiman was awakened from his sleep by a noise on his carport. He noticed his grill overturned but could not identify the loud noise.
Mrs. Lovett arrived home at exactly 11:05 that night. She found the wooden front door open and the storm door slightly ajar. In the house, the lights and the television were on. Her husband's shoes and socks were next to the sofa and their two infants were asleep in their beds. The shirt she had laid out for her husband to wear to work the next morning was still on the dresser but a pair of blue and white checkered pants were missing. There was no sign of disarray or of a scuffle or struggle inside the house. Mrs. Lovett checked around the yard but did not find her husband. However she was not "terribly concerned" because the storm door, which was broken and would automatically lock if closed, "had been fixed where he could get back in". Mrs. Lovett assumed that her husband was visiting a neighbor.
Mrs. Lovett initially reported her husband's disappearance to the Decatur Police Department at 12:30 A.M. that night. A second call around 1:30 A.M. began an investigation into the disappearance and ultimately the death of Charles Ray Lovett.
Mr. and Mrs. Lovett had been married for seven years and had two sons ages six and fourteen months old. They had no domestic or unusual financial problems. Mr. Lovett was a lino type operator at the Decatur Daily News. In the days before his disappearance, Mr. Lovett had been painting his house. He had finished the nursery and completed half of the living room.
On August 26, 1970, Investigator Robert E. Hancock of the Alabama Bureau of Investigation went to Key West, Florida, and found the defendant living in Tamperick Trailer Park. On the windshield of her Volkswagen was an application for a replacement license tag. Pursuant to a search warrant the Volkswagen was searched. It appeared to have new floor mats and new recapped tires. Several items were taken from the automobile for analysis by the Federal Bureau of Investigation. However, of the items taken only three revealed the presence of human blood: a cap, a brown paper bag and a map. The stains on each item were very small and the blood could not be typed.
Investigator Hancock drove the Volkswagen to Miami where it was examined at the Dade County Crime Lab. There everything was taken out of the car; they "tore *Page 670 
it all to pieces". The evidence indicates that the Volkswagen was thoroughly searched and examined for any evidence that would indicate that Charles Ray Lovett was present in the car. Despite these efforts, nothing was found.
Lovett's house was also checked without success. No fingerprints, footprints, bloodstains or evidence that would incriminate the defendant were found.
On November 10, 1970, Glenn Dolvin was convicted for grand larceny in the theft of Lovett's automobile. His conviction was affirmed on appeal. Dolvin v. State, 47 Ala. App. 382,255 So.2d 52, cert. denied, 287 Ala. 730, 255 So.2d 55 (1971).
On November 11, 1970, the defendant gave a statement to Investigator Hancock and asked him to verify her alibi because she had nothing to do with Lovett's disappearance. The defendant made this statement in the presence of and against the repeated advice of her attorney.
In this statement the defendant denied being in Decatur on Sunday, August 16, 1970, and denied any knowledge of or participation in Lovett's kidnapping. She told Investigator Hancock that, on August 11th, her brother, who lived in Bradenton, Florida, had been hospitalized as a result of a fight. On Saturday, August 15th, or Sunday, August 16th, he had just gotten out of the hospital and had called her in Key West.
The defendant maintained that on the Sunday morning of August 16, 1970, she and her husband left their home in Key West, Florida. In their Volkswagen they traveled to Bradenton where they spent Sunday night with her brother. On Monday they drove to Miami and rode around Miami practically all night. Sometime on Tuesday morning they were stopped by a Miami police officer who informed them that there was no tag on the Volkswagen.
On Tuesday, August 18th, the defendant and her husband stopped at a State Trooper office somewhere near Miami and got a temporary permit to drive without a license tag to Key West. After shopping and buying some clothing for the defendant's daughter, the pair returned to Key West arriving around 9:00 or 10:00 Tuesday night. Upon their return they learned of a governor's warrant for Glenn Dolvin's extradition. On Wednesday, August 19th, Glenn Dolvin turned himself in to the Florida authorities. On another occasion the defendant told Investigator Hancock that she and her husband were married in Mexico in February of 1970.
The State produced several witnesses to prove the falsity of the defendant's alibi statement. Joan Quellette, the Assistant Director of the Medical Record Room at Manatee Memorial Hospital in Bradenton, Florida, testified that Manatee Memorial was the only hospital in that county. Hospital records revealed that the only time the defendant's brother was ever admitted to the hospital was on September 12, 1970. He was discharged on September 15th. He was not in the hospital in August of 1970.
Robert Quackenbois lived next to the defendant in Tamperick Trailer Park in Key West, Florida. He testified that the defendant and her daughter, Susan, and Glenn Dolvin and his brother, James, moved in sometime during the middle or latter part of May, 1970. They were living there in August of 1970. Sue and Glenn Dolvin owned a Volkswagen which Mr. Quackenbois testified was "blueish grey" and not green. To the best of his knowledge the defendant and her husband were not home from the Friday afternoon of August 14th until 9:00 or 10:00 Tuesday night, August 18th. During this time he did not see either the defendant, her husband, or their Volkswagen. On Saturday, August 15th, Barbara Neff brought the defendant's daughter to Quackenbois' house and picked her up that same day. Mr. Quackenbois saw James Dolvin every day during this period.
Clarence Lee Simpson was a radio teletype operator for the Florida Highway Patrol in Ocala, Florida. Around midnight of Monday, August 17th, he received a telephone call from a woman who stated that she had lost her automobile license tag. The defendant told Officer Simpson that "a gasoline station attendant had told her that *Page 671 
her tag was missing". Officer Simpson "questioned where she was at and the man (service station attendant) verified that she was in Marion County". About one hour later, at 1:00 on the morning of Tuesday, August 18th, the defendant came to the Troopers' station in Ocala and identified herself as having called earlier. Officer Simpson gave her a lost tag receipt dated August 18, 1970, which would temporarily allow her to drive without a license tag. A few days later an employee of the State Highway Department turned in the lost tag to the Ocala Highway Patrol Office.
There were a lot of camp sites in the area and Officer Simpson thought that the defendant had been camping. To Simpson the defendant "appeared like most of the people that come in there and has been camping. She was dirty, she was smudged up like she had been around charcoal and I took her for just being out in the woods. She had been camping or something." Her hands and fingernails were dirty. She had dirt underneath the fingernails. She had smudges on both her arms and face and her hair "was partially up and partially down. One side was down." The defendant had a "(w)oods type odor like you get from camp fires". The defendant told Officer Simpson that she was headed from Miami back to Alabama and that her husband was asleep on the back seat of the car. Officer Simpson testified that it was four hundred miles from Ocala to Miami, Florida, and one hundred fifty miles from Bradenton to Ocala.
On November 20, 1970, the defendant and her husband were jointly indicted for the kidnapping of Charles Ray Lovett. In February of 1971 the defendant and her husband were convicted in separate trials. The defendant's conviction was affirmed on appeal. Dolvin v. State, 51 Ala. App. 540, 287 So.2d 250 (1973).
The investigation into the whereabouts of Charles Ray Lovett continued. John C. Cardi was a laborer with a road construction firm in Florida. On December 7, 1977, he discovered some bones in a new roadbed in the Lake Mary area near Sanford in Seminole County, Florida. The bones appeared to be human. Under the direction of an investigator for the Seminole County Sheriff's Department, trained in the excavation of skeletal remains, the bones were removed from their burial site and sent to Dr. Joseph H. Davis, Medical Examiner for Dade County. The burial site was approximately three fourths of a mile from an interstate highway.
Dr. Davis concluded that the bones were the skeletal remains of a white, Caucasian adult male somewhere in the mid-twenties "plus or minus". From the presence of shotgun pellets and wadding found in and around the skeleton, Dr. Davis concluded that death was caused by a shotgun wound. On cross examination, Dr. Davis admitted that he was unable to tell, from the skeleton, whether the shotgun wound was the actual cause of death or whether it was inflicted after death.
Dr. Richard Souviron is a forensic odontologist and an associate medical examiner for Dade County. From two photographs of Mr. Lovett he was able to see eight and one-half of Lovett's top teeth. Comparing these to the teeth and chin found on the skeleton he found no inconsistencies. Dr. Souviron noted that the teeth found on the skeleton were "extremely unusual", "extremely rare", and "a freak of nature" because they were so perfect; no teeth were missing, filled or had cavities. Stains on the teeth could indicate that the deceased was a smoker and did indicate that he had not had his teeth cleaned. A slight amount of bone loss on the upper front teeth "would indicate possibly that this individual had a condition referred to as pyorrhea peridontal disease at one time".
Previously Mrs. Lovett had testified that her husband had perfect teeth — no cavities and no fillings. He did have a "slight stain on the bottom of his lower front teeth at the base of the gum" which was caused by "some type of slight gum disorder that he had been treated for years before (they were married), but it had not affected his teeth other than the stain". Mrs. Lovett did not know if this disorder was pyorrhea or not. She testified that, to her knowledge, *Page 672 
her husband never went to the dentist to have his teeth cleaned and smoked about two packs of cigarettes a day.
In Dr. Richard Souviron's opinion the teeth were those of Charles Ray Lovett.
With this evidence the prosecution rested its case.
In her defense, evidence was presented that Mr. Lovett was twenty-nine years old on August 16, 1970; that the defendant's Volkswagen had been vacuumed for evidence and that the defendant's general reputation and reputation for "peace and quietude" in the community where she lived were good. There was no defense presented to the merits of the State's case.
 I
The defendant alleges that the trial court committed reversible error in denying her motion to exclude the State's evidence and in refusing to give her requested written affirmative charge because the evidence was insufficient to justify the submission of the question of her guilt to the jury.
The evidence against the defendant was entirely circumstantial. In the recent case of Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), this Court set out the rules for reviewing a conviction based on circumstantial evidence.
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."
* * * * * *
 "Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court.
 "Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. However circumstantial evidence justifies a conviction only when it is inconsistent with any reasonable theory of innocence."
* * * * * *
 "Guilt is not established by circumstantial evidence unless the facts relied on are such that it is the only conclusion fairly to be drawn from them. If all the material circumstances in evidence point to guilt and exclude any reasonable hypothesis except that of guilt a conviction is warranted.
 "However `it is not every hypothesis, but every reasonable hypothesis but that of guilt, that the circumstantial evidence must exclude'.
 "(T)he true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be `such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused'." (Citations omitted) Cumbo, 368 So.2d at 874-5.
"While mere speculation, conjecture or surmise will not authorize a conviction, the jury is under a duty to draw whatever permissible inferences it may from circumstantial evidence and to base its verdict on whatever permissible inference it chooses to draw." Walker v. State, 355 So.2d 755,758 (Ala.Cr.App. 1978).
In reviewing the facts of this case we think that there was sufficient evidence from which the jury might have excluded every reasonable hypothesis except that of guilty beyond a reasonable doubt. "While not alone sufficient to justify a conviction, motive may strengthen circumstantial evidence."Cumbo, 368 So.2d at 876. Where the evidence is wholly circumstantial, motive *Page 673 
is a material concern. Harden v. State, 211 Ala. 656, 658,101 So. 442 (1924); Nickerson v. State, 205 Ala. 684, 687,88 So. 905 (1921). The defendant's proximity to the place of the crime at a very reasonable hour with the opportunity to commit the crime is a circumstance to be weighed by the jury. Lindsey v.State, 170 Ala. 80, 82, 54 So. 516 (1911); Enzor v. State,24 Ala. App. 346, 349, 135 So. 595, cert. denied, 223 Ala. 297,135 So. 598 (1931). The defendant was identified as being in and near Mr. Lovett's neighborhood late on Sunday night and during the approximate time in which he disappeared. This defendant did not reside in Decatur and was not shown to have any lawful purpose for being there at that time. Her actions were extremely suspicious. Consequently, her presence under the circumstances was a very incriminating factor and one which was for the jury's consideration as was her false explanation of her presence in Decatur and Miami. Cumbo, 368 So.2d at 876. Since the identity of the Miami police officer who allegedly stopped her in Miami was known only to the defendant, the defendant's failure to produce this witness and prove her alibi is a factor the jury was entitled to consider in throwing light on the defendant's guilt or innocence. Kilgore v. State,74 Ala. 1, 9 (1883); Porter v. State, 55 Ala. 95, 107 (1876).
The jury also had a right to consider the geographical proximity of Sanford, Florida, where the skeleton was found, to Ocala, where the defendant was present on the early morning of August 18th, as well as the relatively greater distances of these two places from Bradenton, Miami, and Key West, Florida. The geographical relation and proximity of the locations of the defendant's actions and the home of the deceased are also extremely important factors for the jury's consideration in this particular case.
The position in which the skeleton was found — on its back with knees up and arms and hands crossed in the pelvic area — together with the fact that it was buried under approximately thirty inches of earth, exclude any notion that the death was caused by suicide or accident. The presence of the shotgun pellets within the chest cavity would tend to exclude the possibility of a natural death and indicate that a homicide was involved.
In a murder prosecution the corpus delicti is a fact proof of which may be made by circumstantial evidence. McDowell v.State, 238 Ala. 101, 105, 189 So. 183 (1939). The finding of a dead body or skeleton the appearance of which shows acts of violence, as where the injuries were apparently sufficient to cause death and the surrounding circumstances exclude inferences of accident or suicide, may be sufficient, under the particular circumstances to prove the corpus delicti. Colemanv. State, 57 Ala. App. 392, 328 So.2d 642 (1976); 41 C.J.S. Homicide § 312 (1944).
The State is not required to prove guilt beyond all doubt but only beyond a reasonable doubt. Rice v. State, 204 Ala. 104,106, 85 So. 437 (1920); Talley v. State, 174 Ala. 101, 106,57 So. 445 (1912); Bones v. State, 117 Ala. 138, 23 So. 138
(1898).
The State presented facts from which the jury could reasonably find that the evidence excluded every reasonable hypothesis or theory except that of guilt. It is not the province of this Court to substitute itself for the jury or usurp their function in weighing the evidence. Autry v. State,34 Ala. App. 225, 229, 38 So.2d 348 (1949); Richardson v. State,28 Ala. App. 432, 436, 186 So. 574, reversed on other grounds,237 Ala. 11, 186 So. 580 (1938). Therefore we find no error in the overruling of the defendant's motion to exclude the State's evidence and refusal to give the affirmative charge.
 II
Venue may be established by circumstantial evidence. Tinneyv. State, 111 Ala. 74, 76, 20 So. 597 (1895). Alabama Code (1975), Section 15-2-3, provides:
 "When the commission of an offense commenced in the State of Alabama is consummated without the boundaries of the state, the offender is liable to punishment *Page 674 
therefor in Alabama; and venue in such a case is in the county in which the offense was commenced, unless otherwise provided by law."
The trial court gave a number of written charges requested by the defendant instructing the jury to the effect that the mere abduction of the deceased by the defendant within the geographical boundaries of Morgan County, Alabama, was not sufficient to justify a conviction and that they must be convinced beyond a reasonable doubt and to a moral certainty that the defendant or an accomplice "perpetrated such act or acts or set in motion such force or forces within the geographical boundaries of Morgan County, Alabama, which resulted in the death of the deceased" regardless of the place where death occurred.
Section 15-2-3 does not apply where the crime is a single indivisible offense. DeGraffenried v. State, 28 Ala. App. 291,182 So. 482 (1938). However, even in the absence of a statute authorizing it, the State in which the fatal blow was given may maintain a prosecution for the crime of murder, although death occurs in another state. Green v. State, 66 Ala. 40 (1880). Without detailing the evidence, as we have previously set it out, there was some evidence from which the jury could infer that the fatal blow was inflicted in Morgan County. Generally see 22 C.J.S. Homicide § 185 (17) (1961); West v. State,54 Ala. App. 647, 312 So.2d 45, cert. denied, 294 Ala. 775,312 So.2d 52 (1975).
 III
The trial court did not commit error in denying the defendant's motions for a change of venue and for a continuance based on prejudicial pretrial publicity.
Unquestionably there was widespread publicity by radio, television, and press of the events surrounding Mr. Lovett's disappearance, Glenn Dolvin's separate trials for grand larceny, kidnapping and murder and the defendant's separate trials for kidnapping and murder. Yet the existence of widespread publicity alone does not entitle a defendant to a change of venue. Anderson v. State, 362 So.2d 1296, 1998
(Ala.Cr.App. 1978); Mayola v. State, 344 So.2d 818, 821
(Ala.Cr.App.), cert. denied, Ex parte Mayola, 344 So.2d 822
(Ala. 1977).
 "Except in the situation where there is a showing of `inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors', the trial court's primary responsibility in dealing with allegedly prejudicial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial." Anderson, 362 So.2d at 1298-9.
The record before us presents absolutely no evidence of any actual prejudice to the defendant resulting from extensive publicity. Without proof of prejudicial influence this Court will not hold the trial court in error for refusing to grant a motion for a change of venue or a continuance based on pretrial publicity. Mayola, 344 So.2d at 821; Anderson, supra.
Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity generated by the news media and the existence of actual jury prejudice. Anderson, 362 So.2d at 1300. The record contains no showing of actual jury prejudice. Indeed the State produced the affidavits of ninety-two citizens of Morgan County that the defendant could receive a fair and impartial trial.
Before denying the motion for a continuance the trial judge stated:
 "I want to say for the record that I do not consider all of these news items highly prejudicial. That's the defendant's opinion. I don't think they are because we couldn't try it if we thought they were. I think they are factual accounts, the ones that I have seen."
On voir dire, defense counsel questioned the venire as to whether any member had an opinion that the defendant was guilty as charged. Five members indicated that because *Page 675 
of what they had read and heard, they might be influenced. Responding to further questioning by defense counsel, two of these five indicated that they could disregard the publicity surrounding the case.
In overruling the motion for a continuance the trial judge stated:
 "(W)e have a sufficient number of jurors who are unbiased and who say they are unbiased according to the Court's opinion and I think that we ought to proceed with it."
Nothing in the record contradicts this. The denial of the defendant's motion for a continuance was not error. Collins v.State, 234 Ala. 197, 174 So. 296 (1937); Liddell v. State,287 Ala. 299, 251 So.2d 601 (1971); Turk v. State, 348 So.2d 878
(Ala.Cr.App. 1977); Humphries v. State, 346 So.2d 45
(Ala.Cr.App. 1977).
 IV
The defendant argues that her statement should not have been admitted into evidence because the State did not show that the statement was not the product of threats, promises, or improper inducements and because the defendant was being illegally detained in that there was no probable cause for her arrest.
On November 11, 1970, the defendant was taken into custody by Investigator Hancock in Decatur. She was placed in a lineup and identified by Mrs. Lovett and Miss Garrett. Immediately after the lineup a formal arrest warrant was served on the defendant. She was advised of her constitutional rights and made a statement against the advice of her attorney. The statement was exculpatory and to the effect that the defendant had an alibi and knew nothing of the kidnapping and murder. The evidence shows that her attorney was present during part of the lineup, if not all of it, and was with the defendant before any questioning began and during the entire period in which she made the statement.
Because they are so abundant and obvious we will not detail all the particular facts to support our conclusion that Investigator Hancock had probable cause to arrest the defendant without a warrant. Campbell v. State, 354 So.2d 325, 327
(Ala.Cr.App. 1977); Knight v. State, 346 So.2d 478, 481
(Ala.Cr.App.), cert. denied, 346 So.2d 483 (Ala. 1977). The information possessed by Sergeant Hancock when he took the defendant into custody is not required to constitute evidence sufficient to support a conviction. Yeager v. State, 281 Ala. 651,653, 207 So.2d 125 (1968).
A review of the totality of the circumstances convinces this Court that the defendant's statement was voluntary despite the fact that there was no specific testimony showing that her statement was not the product of threats, promises, or other improper inducements. The defendant's attorney was present before and during the time the defendant was questioned. The defendant was not questioned "about anything" before her attorney arrived. The defendant, although repeatedly advised not to make any statement or answer any questions, said she wanted to talk; that "she was tired of being accused of these things and she thought it was time for the truth to come out and she wanted to talk about it". The defendant wanted the police to "check out" her story and verify it.
There was absolutely no evidence to contradict the State's showing of voluntariness. The facts that the defendant's daughter was not with the defendant and had been taken to another part of the building and that the defendant was nervous and crying do not show that the statement was involuntary.Arnold v. State, 348 So.2d 1092, 1096 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala. 1977). At trial defense counsel did not specifically object to the State's failure to show the absence of improper inducement. Considering the totality of the circumstances, the facts and conditions under which the statement was given indicate that the statement was not improperly induced. Laffitte v. State, 370 So.2d 1108, 1110
(Ala.Cr.App.), cert. denied, 370 So.2d 1111 (Ala. 1979). *Page 676 
 V
The instructions of the trial judge defining malice were proper. Lowery v. State, 294 Ala. 347, 317 So.2d 360 (1975), reversing the case of Lowery v. State, 55 Ala. App. 511,317 So.2d 357 (1974), relied upon by the defendant.
Since there was evidence to show that the deceased was killed by a gunshot wound, it was not error for the judge to instruct on the presumption of malice arising from the use of a deadly weapon, despite the fact that the evidence did not show the immediate facts and circumstances of the actual shooting. The facts surrounding the deceased's kidnapping and death support this charge.
 VI
Dr. Richard Souviron identified the skeletal remains of Mr. Lovett. Dr. Souviron is a forensic odontologist and an associate medical examiner for Dade County, Florida. In the twelve years he has served in that position he has worked on approximately six hundred dental identification cases.
Dr. Souviron examined the jawbone and teeth of the skeleton. He concluded that the remains belonged to those of a white male somewhere between the ages of twenty-five and thirty-five years. He noted several significant factors about the teeth. All of the teeth were perfect; all were in line, there were no fillings, no cavities, no caps, no missing teeth. From stains on the teeth he concluded that the individual was a smoker and that he had not had his teeth cleaned. From a slight amount of bone loss on the upper front teeth he concluded that the individual had pyorrhea peridontal disease at one time. He characterized the set of teeth as extremely unusual: "This man is a freak of nature in the sense that he had such a perfect set of teeth"; "It's extremely rare. Very rare." "It's like a needle in a haystack to find something like this."
Dr. Souviron compared the skeleton with two pictures made of Mr. Lovett while he was living. By enlarging both photographs, Dr. Souviron could see eight and one-half of Lovett's upper teeth. He did not find anything that "would rule this individual out". Souviron also compared the configuration of the chin, the formation of the base of the orbit of the eye, the teeth themselves and everything was consistent and no inconsistencies were found. He testified in detail as to his findings, how they were made, and how he arrived at his conclusions. Based upon his examination he concluded that the skeleton remains belonged to the person (Lovett) in the photographs.
The defendant objected to Dr. Souviron being allowed to state his conclusion and opinion because it had not been shown to be a "scientifically recognized procedure for identification". On appeal the defendant contends that there is no general scientific acceptance of identifying skeletal teeth and jawbones by microscopic comparisons with photographs of a living person.
Alabama Code (1975), Section 12-21-160, authorizes the admission of the "opinions of experts on any question of science". In Chatom v. State, 348 So.2d 838, 841-2 (Ala. 1977), the Alabama Supreme Court upheld the admission of the results of an atomic absorption test.
 "The result of examinations and test, blood-grouping tests, fingerprint comparisons, and ballistics tests are admissible, provided a proper foundation is laid. Here, the foundation was very limited and had there been a request, the trial court would have been required to allow the defendant to thoroughly question the expert concerning his training and experience, to present other testimony that the test was not scientifically acceptable."
When defense counsel objected because the comparison was not "a scientifically recognized, reliable procedure and technique", the trial judge asked Dr. Souviron:
 "THE COURT: Let me ask you this. Is what you did a recognized way of comparing these things in the field of science that you are in?
"A. Yes, sir."
Later defense counsel objected and the trial court made particular reference to this question and answer. *Page 677 
 "THE COURT: Well that's the only evidence before us on that particular subject (whether the comparison was or was not a scientifically recognized procedure for identification). Since it is the only evidence on the subject, I don't think anybody except an expert would know that. You will have the opportunity of rebutting that, of course, but at this particular time I will overrule it.
 "MR. KNIGHT: Your Honor, for the further grounds that this witness's single answer invades the province of the Court in that this is a matter that the Court must establish. A factual finding as to whether or not this is a scientifically recognized procedure.
 "THE COURT: I would be glad to hear you if you have some evidence outside the hearing of the jury to rebut that.
"MR. KNIGHT: Judge, we rest on our objection.
 "THE COURT: All right. With the only evidence before the Court being that of the expert witness who is here, the Court will have to overrule the objection."
The trial court complied with Chatom. The expert's opinion was properly admitted. Here the comparison was based on the training, experience, and skill of one expert. He was properly permitted to testify that the methods he employed were scientifically acceptable. The mere fact that these particular identification procedures-comparison of the actual teeth and jawbones with photographs of their suspected owner-are seldom used does not mean that they are unacceptable.
The defendant has alleged several additional grounds of error as reasons why her conviction should be overturned. Although we do not address these other issues in this written opinion we have given them careful attention and study. After reviewing the entire record we are of the opinion that the defendant received a fair trial. The judgment of the Circuit Court is affirmed.
AFFIRMED.
All Judges concur.