348 So.2d 838 (1977)
In re Jerre CHATOM
v.
STATE of Alabama.
Ex Parte State of Alabama ex rel. Attorney General.
SC 2168.
Supreme Court of Alabama.
June 17, 1977.
*839 William J. Baxley, Atty. Gen. and Ellis D. Hanan, Asst. Atty. Gen., for petitioner the State.
PER CURIAM.
We granted certiorari to review the per curiam decision of the Court of Criminal Appeals in 1 Div. 688, Chatom v. State, (1976), 348 So.2d 828.
The issue presented is whether the results of an "atomic absorption test" [1] were properly admitted into evidence.
Chatom was tried and convicted for the first degree murders of deputies David Beck and Robert Stolz. He was sentenced to life imprisonment in the penitentiary. The Court of Criminal Appeals reversed and remanded. The facts of the case are well stated in the opinion of that court and need not be repeated here.
In reversing the trial court, a majority of the Court of Criminal Appeals held:
"The State did not lay the proper predicate for the admission of the atomic absorption test in the present case, and the appellant's motion to exclude should not have been denied."
And in its opinion, on rehearing, the majority of that court held:
"* * * [R]eversal was due to the introduction into evidence of the atomic absorption test without a proper predicate."
* * * * * *
"We emphasize that reversal results solely from the admission of the improperly predicated test."
For a better understanding, we have referred to the record.
Since there is no dispute concerning what occurred when the results of the atomic absorption test were admitted, we examined the original record for a more complete understanding of the opinion of the Court of Criminal Appeals. Cf. Wilbanks v. State, 289 Ala. 171, 266 So.2d 632 (1972). For convenience, we set out the entire predicate offered by the state, and the opinion elicited, without there having been any objection raised by the defendant:
"MR. GRADDICK:
"Q All right, Doctor state your full name to the jury, please, sir.
"A John Rufus McDuffie.
"Q Doctor, who do you work for?
"A The Alabama Department of Toxicology in Criminal Investigation.
"Q Where are you located, Doctor.
"A At Auburn, Alabama.
"Q How long have you been with the department?
"A Approximately three years.
"Q What kind of degrees do you have, please, sir?
*840 "A I have a B.S. in chemistry from Emory University. I have a Ph.D. from Auburn University.
"Q Over the past three years have you had an opportunity to work a machine or an examination called atomic absorption?
"A Yes, I have.
"Q Explain to the jury what that is, please, sir.
"A This is a machine that analyzes for certain elements by atomizing the elements due to heat. In other words, what it does is simply vaporize the elements into a light path. Once the elements are in the light path they are picked up by a light path and the machine can analyze as to the amount present or the particular element present based on the particular light beam that you put through it.
"Q Does this particular test also or will it, along with a number of other things, determine primer residues?
"A Yes, sir.
"Q Did you have sent to you from Jim Small, the toxicologist here, a certified package containing several swabs?
"A Yes, sir, I did.
"Q Was it sealed and . . .?
"A Yes, sir.
"Q . . . unopened when you received it?
"A Yes, sir.
"Q Did you receive it personally?
"A Yes, sir.
"Q Did you obtain the swabs?
"A Yes, sir.
"Q Did you run any swabs on this atomic absorption test?
"A Yes, sir, I did.
"Q Do you have an opinion as to whether or not there was any primer residues on these swabs?
"A Yes, sir.
"Q What is that opinion?
"A My tests failed to reveal the presence of certain elements consistent with primer residues.
"Q Is that consistent with a person not having fired a recently fired weapon?
"A Yes, sir.
MR. GRADDICK: Your witness."
Defendant's objection came in the form of a motion to exclude, as follows:

"CROSS-EXAMINATION
"BY MR. ALONZO:
"Q Is this test infallible?
"A No, sir.
"Q Have you ever run such a test on Milo Sennett:
"A I am not certain as to whether I have or not, sir.
"Q You know who I'm talking about Mr. Milo Sennett?
"A Yes, sir.
"Q What is the accuracy percentage of this machine, of this test, in the last survey that you've made?
"A I'm not certain sir. On tests that I have run myself where I know a gun has been fired, is that what you're asking? I would guess, sir, it's in the neighborhood of 75 to 80 percent of the time.
"Q That is all? Seventy-five to eighty percent of the time?
"A Yes, sir.
"Q The lie detector test is better than that.
"MR. GRADDICK: At this point I am going to ask the Court to excuse the jury, Judge.
"THE COURT: Very shortly, gentlemen.
"(Whereupon, the jury retired from the courtroom, and the following occurred outside the presence of the jury:)
"THE COURT: All right, I know what you're talking about and the only reason I excused the jury, Mr. Alonzo's remarks about lie detector tests I am sure is the reason for the jury being dismissed. We will not talk about the lie detector test. I have previously ruled it inadmissible, as has *841 the Supreme Court of the United States. That's that and I don't want to hear any more about it. Bring the jury in.
"(Whereupon, the jury returned to the jury box and the following proceedings were had and done in the presence of the jury:)
"THE COURT: Any other questions?
"MR. ALONZO: No, sir, but we would move to exclude this gentleman's testimony because a probability of 70 to 75 percent accuracy is certainly mightly low, Judge, and I believe, following the logic of the law that we've already submitted to Your Honor, that with this low probability this type of testimony has no presence in this trial whatsoever.
"THE COURT: I'll reserve a ruling on that. Anything further?
"MR. ALONZO: Not from this gentleman, no sir.
"THE COURT: Mr. Graddick?
"MR. GRADDICK: No, sir.
"MR. KULAKOWSKI: Judge, we would like to have a ruling at this time on that.

* * * * * *
"(Whereupon, the jury retired from the courtroom and the following occurred outside the presence of the jury:)
"THE COURT: The only thing that has not been ruled upon is the question of the admissibility of the test performed by Dr. McDuffie. If you have any cases you want to submit to me at this time you can go ahead.
"MR. KULAKOWSKI: May it please the Court, from the great State of Colorado comes a case in regards to the admissibility of the paraffin test, which is all but identical, and the Court ruled that it had not gained that standing and scientific recognition or demonstrated that degree of reliability to justify courts in approving its use. The case is Brooke v. People, 139 Colo. 388, 339 P.2d 993. It's a 1959 case. We would submit, may it please the Court, that based on (inaudible) that unless the probabilities beyond a reasonable doubt and to a moral certainty lead to an inference, that scientific tests in Alabama are not admissible unless that degree of certainty has been displayed to the Court. There is a legal question before the Court concerning the admissibility and we submit that the probabilities of 70 percent are not sufficient to be admissible before the Court and we ask the Court to exclude that evidence and instruct the jury to that effect.

* * * * * *
"THE COURT: Motion is denied."
It is apparent from the record that Chatom's attorneys objected only to the accuracy of the atomic absorption test, and its admissibility vel non. Chatom's attorneys made no objection whatsoever to Dr. McDuffie's qualifications, which they clearly had a right to do. See Tit. 7, § 443, Code. In addition, they could have presented their own expert witness to impeach the state's toxicologist. The defendant, in fact, presented some evidence relative to the fallability of the atomic absorption test. Finally, defense counsel could have requested the trial court to instruct the jury as to the weight, if any, which may be given to the opinion testimony of expert witnesses especially as to the testimony of expert witnesses in regard to the results of scientific tests.
As we understand the argument of Chatom's attorneys, it is based on the fact that the atomic absorption test has not gained sufficient standing in the scientific community to be accepted as reliable in a court of law. In other words, the atomic absorption test, like the lie detector test, is inadmissible, as a matter of law. We refuse to hold that.
The increasing use of technology in criminal investigations, when consistent with the rights of the accused, should not be inhibited. The results of examinations and test, blood-grouping tests, fingerprint comparisons, and ballistics tests, are admissible, provided a proper foundation is laid. Here, the foundation was very limited and had there been a request, the trial court would have been required to allow the defendant to thoroughly question the expert concerning his training and experience, to *842 present other testimony that the test was not scientifically acceptable. In any event, we are unwilling to follow a 1959 Colorado decision which holds that the test is inadmissible, as a matter of law. By holding that the test is admissible we do not mean to be understood as opining that every atomic absorption test is admissible. The question of the competency of the operator and the methods used are questions which address themselves to the discretion of the trial judge, whose decision will not be disturbed. On appeal except for palpable abuse, Tit. 7, § 437, Code. See Maslankowski v. Beam, 288 Ala. 254, 259 So.2d 804 (1972); McCormick, Handbook of the Law of Evidence, § 13 (2d Ed. 1972); Dec. Dig., Evidence.
In Luckie v. State, 55 Ala.App. 642, 318 So.2d 337, 340, cert, denied 294 Ala. 764, 318 So.2d 341 (1975), the Court of Criminal Appeals stated:
"The question of the qualifications of a person to testify as an expert rests largely in the discretion of the trial court and will not be disturbed by the appellate courts in the absence of abuse."
See Ala.Digest, Criminal Law, Vol. 6.
The record reflects that Dr. McDuffie testified to his educational background, his training with the Alabama Department of Toxicology, his experience in performing the atomic absorption test, the purpose of the test, the manner in which he conducted the test on Wilson, and the results of the test in question, all without objection. Accordingly, we find that the trial court did not abuse its discretion by allowing Dr. McDuffie to testify as an expert in connection with the scientific test results.
The judgment of the Court of Criminal Appeals is reversed, and the cause is remanded.

REVERSED AND REMANDED.
TORBERT, C. J., and BLOODWORTH, MADDOX and FAULKNER, JJ., concur.
BEATTY, J., concurs specially.
ALMON, J., dissents, with whom JONES, SHORES and EMBRY, JJ., concur.
BEATTY, Justice (concurring specially).
Apparently, the only reason the State called Dr. McDuffie as a witness was to get into evidence the results of the test he conducted. The predicate for admitting that test may have been deficient because there was no showing of scientific reliability, cf. State v. Miller, 64 N.J.Super. 262, 165 A.2d 829 (1960) (foundation for drunkometer reading); People v. Williams, 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549 (1959) (effect of narcotic addiction upon veracity character); Harris v. State, 239 Ark. 771, 394 S.W.2d 135 (1965); and if counsel had made a timely objection, even a general objection, perhaps we would have a different case before us. Here, however, counsel made no objection of any kind to the introduction of the test results, and thus he waived any objection to its admissibility. A defendant cannot speculate on what a witness will say, and when the answer is responsive but unfavorable move to have that answer excluded. Tanner v. State, 37 Ala. App. 256, 66 So.2d 827; cert, granted, 259 Ala. 306, 66 So.2d 836 (1953); Matson v. State, 27 Ala.App. 396, 173 So. 612; cert, den., 234 Ala. 74, 173 So. 617 (1937); Ala. Dig., Crim. Law. I believe that by his failure to raise the issue of the test's reliability until after the results were already in evidence without objection, defendant made his own rule of evidence.
ALMON, Justice (dissenting):
I would quash the writ as improvidently granted. The Court of Criminal Appeals has reached the correct result.
A proper predicate was not laid for the admission into evidence of the results of the atomic absorption test. Moreover, scientific tests which are only 75% to 80% accurate are so unreliable as to raise serious due process questions.
JONES, SHORES and EMBRY, JJ., concur.
NOTES
[1] The atomic absorption test, commonly referred to as the gunshot residue test, is used by a forensic laboratory to trace analyses of metals, particularly iron and lead in biological specimens. 22 Proof of Facts, Instrumental Analysis (Atomic Absorption), §§ 62-70. One use of atomic absorption in forensic analysis is to determine antimony and barium from paraffin casts from the hands of persons suspected of having recently fired a gun. 22 Proof of Facts, Instrumental Analysis, § 5.5 (Supp.); 15 Proof of Facts, Neutron Activation Analysis, §§ 1-9.