BOWEN, Presiding Judge.
On the night of November 17, 1980, Geraldine Hayles was strangled to death by an intruder in her home. The defendant was indicted and convicted for the capital offense involving an intentional killing during the commission of a burglary. Alabama Code Section 13A-5-31(a)(4) (1975). In accordance with the jury’s recommendation at the punishment fixing phase of the trial, the trial judge sentenced the defendant to life imprisonment without parole. Three issues are presented on appeal.
I
The trial judge properly overruled the defendant’s motion to suppress the physical evidence and testimony resulting from a search pursuant to a warrant of the residence where the defendant was arrested.
While the affidavit in support of the search warrant is not recommended as a model for imitation, it was sufficient to ■ justify the issuance of the warrant. The affidavit itself, which was admitted into evidence, shows that the affiant, Lieutenant Ronald Mair of the Mobile Police Department, signed the affidavit and presented it to the issuing judge. The affidavit and the search warrant dispute the defendant’s contention that “there is no showing that any evidence was presented to the judge, under oath, or that the witness, Lieutenant Mair, was ever examined by the judge” as required by Section 15 5 — 4, Code of Alabama 1975. The “search affidavit” reflects that Lieutenant Mair personally appeared before a judge of the district court of Mobile County and swore to the facts of the affidavit. This affidavit is signed by both the lieutenant and the judge. The search warrant signed by the district judge recites “affidavit having been made before me.”
Lieutenant Mair was at the scene on the night of the burglary-murder. The victim’s eight-year-old granddaughter gave him an eyewitness account of the crime and a description of her grandmother’s killer. He participated in a house-to-house search for the assailant described by the young child and was present when the defendant was arrested at his grandmother’s house the day following the murder. This was the same address described in the affidavit and search warrant. Lieutenant Mair was present at the police station that same day of the defendant’s arrest when the child twice identified the defendant.
The police had information that the defendant lived with his grandmother: “We ... knew from talking to different ones that he was living at that residence.” * * “By people telling us, that’s where his grandmother lives.”
*1129 Mobile police detective Rivers Johnson testified that he established the defendant’s residence by “picking up an anonymous young lady” who was a “friend of the Defendant” who showed him the defendant’s residence. “(E)ven a first-time citizen-informer need not have a ‘track record’ of good past performance in order to have his information credited.” Moylan, Hearsay And Probable Cause: An Aguilar and Spinelli Primer, 25 Mercer L.Rev. 741, 765 (1974). See also Jaben v. United States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965). The facts contained in this record show that the constitutional requirements of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), were satisfied, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and demonstrate the existence of probable cause for the arrest of the defendant and the search of his residence.
II
Elaine Scott, a criminalist with the Alabama Department of Forensic Sciences specializing in forensic serology, testified, over objection, that approximately forty-five percent of the population have blood group 0 and that approximately ten percent of the population have blood group B. Her testimony was based on statistics “put out” by the F.B.I. Laboratory. The defendant contends that witness Scott was not properly qualified to testify to these statistics.
At trial, defense counsel’s objections were (1)“improper predicate, as to her knowledge of that” and (2) an objection that “she’s (not) properly qualified to give any statistical evidence as to percentages.”
Ms. Scott was qualified as an expert in forensic serology by her education, training and experience. She stated that she had received “training as to blood types, and what portion of the population have those blood types.” The statistics she “normally” used were the ones used by the F.B.I. Laboratory. She had used these statistics “on previous occasions in testifying in court” and testified that they are used “generally in the practice of serology.”
Blood grouping evidence is admissible in a criminal prosecution. Chatom v. State, 348 So.2d 838, 841 (Ala.1977); Annot. 2 A.L.R. 4th 500, Section 4(a) (1980); Annot. 46 A.L.R.2d 1000 (1956). In civil divorce cases see Balfour v. Balfour, 413 So.2d 1167 (Ala.Civ.App.1982).
The percentages of the distribution of the different blood groups among the population as testified to by Ms. Scott are recognized and accepted as general guidelines. See 2 Am.Jur. Proof of Facts, Blood Types, 607, 609 (1959); J. Richardson, Modern Scientific Evidence, Section 12.2 (2nd ed. 1974); E. Imwinkelried, Scientific And Expert Evidence pp. 940-41 (2nd ed. 1981).
In Chatom, 348 So.2d at 842, our supreme court recognized that “the question of the qualifications of a person to testify as an expert rests largely in the discretion of the trial court and will not be disturbed by the appellate courts in the absence of abuse.” Considering Ms. Scott’s educational background, training, experience, and testimony that the statistics she used were generally used in the practice of serology, we find that the trial judge did not abuse his discretion in allowing her to testify as an expert in connection with blood groups and their distribution. We agree with the trial judge that the witness was qualified and that the alleged lack of her knowledge or qualifications went to her credibility and not her competency.
Ms. Scott’s testimony as to what percent age of the population possessed blood types B and O was reasonably within her area of experience. Redd v. State, 240 Ga. 753, 243 S.E.2d 16 (1979). Testimony concerning blood grouping statistics, based on journals published nationwide by a named pharmaceutical company, has been admitted in evidence under an exception to the hearsay rule based upon principles of necessity and trustworthiness. People v. Gillespie, 24 Ill.App.3d 567, 321 N.E.2d 398 (1974). In State v. Rolls, 389 A.2d 824 (Me.1978), a sufficient foundation was laid for the introduction of an expert’s opinion that five percent of the population possessed a combination of three *1130 blood characteristics possessed by the victim, and found in a bloodstain on the defendant’s pants, where the trial judge heard evidence from which he could have found as a preliminary fact that the blood-grouping surveys from which the expert witness drew his conclusions were of a type which were reasonably relied upon in the field. In People v. Romero, 42 Colo.App. 20, 593 P.2d 365 (Colo.App.1978), it was held that the testimony of a serology expert was admissible although the expert relied on tables produced by a pharmaceutical company, since the expert was competent to judge the reliability of the information upon which his testimony was based.
Ill
No written charge was requested on the defense of alibi. There was no objection to the trial judge’s failure to instruct the jury on this defense. There is therefore nothing for this Court to review. Allen v. State, 414 So.2d 989 (Ala.Cr.App.1981), affirmed, Ex parte Allen, 414 So.2d 993 (Ala.1982).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.