[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 298 
Rickey Allen Prewitt was convicted of "murder for hire" pursuant to § 13A-5-31 (a)(7), Code of Alabama 1975, for the brutal slaying of Mrs. Paul Leverett. In accordance with the jury's recommendation, the trial court sentenced Prewitt, the appellant herein, to life imprisonment without parole.
On the afternoon of May 30, 1980, Mrs. Leverett was murdered in her own home in Mobile, Alabama. The coroner testified that the victim died from a combination of gunshot and knife wounds. She had been shot once in the face and once in the neck. The latter shot, apparently, had first penetrated the victim's left hand before it entered her neck. The victim's throat had been slashed by at least four independent movements of a very sharp knife. The victim had also received a number of other knife wounds on her face and chest, at least some of which were inflicted by a long, sharp knife. The coroner further explained that all of the wounds could have been, and probably were, inflicted within a matter of seconds. He estimated that the victim had died within three hours of receiving those extensive injuries and that the time of death was between 3:00 p.m. and 5:20 p.m.
The key prosecution witness was Hilton Connell Robinson, a convicted criminal, who was an acquaintance of the appellant at the time of the instant offense. Robinson testified that on the afternoon of the murder, between 4:00 p.m. and 5:00 p.m., the appellant met him at Robinson's place of business in Mobile and told him that he, the appellant, pursuant to a "contract for hire," had murdered Mrs. Leverett in her own home. Robinson described the grisly details of the crime as they were, allegedly, related to him by the appellant. The details described by Robinson were substantially consistent with the circumstantial evidence presented by the state, including the physical evidence at the murder scene and the wounds inflicted upon Mrs. Leverett. Robinson further testified that he witnessed the "pay-off," when Mr. Leverett delivered $10,000 in one-hundred-dollar bills to the appellant.
The State also presented evidence that the appellant had made statements to others about his involvement in certain "murders for hire" statements which, arguably, referred to Mrs. Leverett's murder, and evidence that the appellant had purchased, just weeks before Mrs. Leverett's murder, a .357 Magnum pistol and a Gerber knife, weapons which were consistent with the wounds inflicted upon Mrs. Leverett.
The appellant presented an alibi defense. His mother and father testified that, on the day Mrs. Leverett was murdered, the appellant arrived at their home in Ackerman, Mississippi, between 12:30 p.m. and 2:00 p.m., and that he remained with them for the rest of the afternoon. The owner-operator of the Ackerman Supply Company, a friend of the appellant, testified that the appellant was in his store in Ackerman, Mississippi, between 11:00 a.m. and 1:30 p.m. on the day of the murder, and that Ackerman, Mississippi, is approximately 210 miles from Mobile, Alabama. (Robinson had previously testified that the appellant told him that he, the appellant, had *Page 299 
arrived in Mobile by airplane at around noon on the day of the murder.)
The appellant also presented extensive evidence to discredit Robinson's testimony. Numerous witnesses testified that Robinson's general reputation in the community was "bad." Robinson, himself, had admitted that he was a convicted criminal. Other witnesses testified that Robinson had agreed to cooperate with the State and to testify against the appellant in exchange for the State's assistance in obtaining a reduction in those sentences which had already been imposed upon Robinson for two then-recent convictions.
The appellant did not testify in his own behalf.
The sufficiency of the evidence for conviction is not challenged on this appeal.
There is no merit in appellant's argument that the trial court's dismissal of a certain prospective juror, due to her opposition to capital punishment, constituted a Witherspoon
violation. "The holding in Witherspoon is not applicable where the jury recommends a sentence less than the death sentence."Eady v. State, 284 Ala. 327, 224 So.2d 876 (1969); see, Brinksv. State, 44 Ala. App. 601, 217 So.2d 813, cert. denied,283 Ala. 712, 217 So.2d 820 (1969); see also, Witherspoon v.Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788,20 L.Ed.2d 797 (1968). The appellant was sentenced, in this instance, to life imprisonment in the penitentiary without parole, rather than "death."
The appellant contends that, on three separate occasions during the presentation of the State's case in chief, evidence which referred to other possible, independent, offenses was presented in the presence of the jury. He argues that the combination of these three incidents effectively denied him his constitutional right to a fair trial. We disagree.
Contrary to appellant's arguments, only one of the incidents specifically referenced a possible, independent offense. Angie Smith testified that she met the appellant in July 1980 (after the instant offense had been committed), and that she lived with him from September 1980 until February 1981. The prosecutor questioned Smith, on direct examination, in an attempt to disclose any incriminating statements or admissions, with reference the instant offense, that the appellant might have made to her. Smith told the jury that during one conversation with the appellant in July or August 1980, he mentioned that he had previously squandered a large sum of money that he had received for a "job" that he had done in the spring of 1980. In a later conversation, in response to Smith's warning that the police might arrest him for some unpaid traffic tickets, the appellant told her that the traffic tickets were the "least of his worries" because the statute of limitations had not run "on that homicide I did." During the prosecution's apparent attempt to connect these statements with the instant offense, the following occurred:
 "Q. He said — Did he tell you when he did the homicide?
"A. I didn't ask.
"Q. Did he tell you who he had killed?
"A. Some hot shot up north.
"Q. Did he provide — Now, this conversation —
"THE COURT: Mr. Galanos, Mr. Hanley, let me see you."
During the "bench conference" which followed, a conference called by the trial court even though there had been no objections by the appellant to this line of testimony, the trial court ruled that Smith's testimony concerning these conversations with the appellant was inadmissible because of the risk of injecting illegal evidence of another offense, unrelated to the instant offense. However, the trial court denied appellant's motion for a mistrial and, instead, instructed the jury to disregard Smith's last answer about "a job done up north." The trial court polled the jurors, each of whom indicated that he or she could disregard Smith's last answer and focus on the "allegations of the indictment." *Page 300 
The trial court's prompt, and unsolicited, actions in this instance cured any error that was introduced by Smith's unexpected answer to the prosecutor's question. See, Huffman v.State, 360 So.2d 1038 (Ala.Crim.App. 1977), affirmed,360 So.2d 1045 (Ala. 1978); Barbee v. State, 395 So.2d 1128
(Ala.Crim.App. 1981), and cases cited therein; Wood v. State,416 So.2d 794 (Ala.Crim.App. 1982).
Moreover, evidence of another "murder for hire" committed by the appellant might well have been admissible as an exception to the general exclusionary rule, if relevant to prove a "motive" for the instant offense, or to "identify" the appellant through a common scheme or pattern or a distinctmodus operandi. See, generally, C. Gamble, McElroy's AlabamaEvidence §§ 69.01 (6)-(8) (3d ed. 1977); see also discussionsin, Bynum v. State, 348 So.2d 804 (Ala.Crim.App. 1976), cert. denied, 348 So.2d 828 (Ala. 1977), cert. denied, 434 U.S. 1034,98 S.Ct. 766, 54 L.Ed.2d 781 (1978); Allen v. State,380 So.2d 313 (Ala.Crim.App. 1979), cert. denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49
(1980); and Brewer v. State, 440 So.2d 1155 (Ala.Crim.App.), cert. denied (Ala. 1983). The applicability of these exceptions cannot be determined from this record because, in its desire to protect appellant's rights, the trial court preempted further inquiry into the details of the alleged other offense, details which might have rendered evidence of such an offense admissible.
The other two alleged references to another offense committed by this appellant are not substantiated in the record. Sandra Shephard, another acquaintance of the appellant, who met him after the instant offense had been committed, testified, over appellant's objection and after a thorough voir dire examination by both parties and by the trial court, that during conversations with the appellant in December 1980 he told her that he had previously killed someone for money and that he had been "offered a hit job before." Another witness testified that he had learned that the appellant had purchased "fourteen different firearms" from the Ackerman Supply Company.
Neither of these incidents specifically referenced another offense committed by the appellant. Shepard's testimony logically implied appellant's involvement in Mrs. Leverett's murder. This evidence was admissible either as appellant's own "admission" that he had indeed committed the instant offense, or as proof of his motive ("murder for hire") for the instant offense. See, generally, Miller v. State, 48 Ala. App. 28,261 So.2d 447, cert. denied, 288 Ala. 746, 261 So.2d 451 (1972);Hines v. State, 50 Ala. App. 161, 277 So.2d 905, cert. denied,291 Ala. 783, 277 So.2d 912, cert. denied, 414 U.S. 1010,94 S.Ct. 374, 38 L.Ed.2d 248 (1973).
The testimony about appellant's purchases of firearms was an unresponsive answer to a question by the prosecutor. The jury was promptly and properly instructed to disregard it and each juror, when polled, indicated that he or she would be able to do so. These instructions cured any possible harm caused by this unresponsive answer. See, McHellen v. State, 351 So.2d 689
(Ala.Crim.App. 1977); Wood v. State, supra; Carter v. State,420 So.2d 292 (Ala.Crim.App. 1982).
As explained above and as is evident throughout the record, the trial court was in complete control of the proceedings at trial. For aught that appears, its rulings on the three incidents discussed above were well-reasoned and correct. The trial court took every precaution to safeguard appellant's right to a fair trial. Under these circumstances, with regard to the above three incidents, its overruling of some of appellant's objections and its denial of his several motions for a mistrial did not constitute reversible error. See, Woodv. State, supra.
The appellant further argues that he was denied "the right to call and question witnesses in his own behalf" when the trial court granted the state's "Motion in Limine" with respect to the testimony of *Page 301 
witness Mary Williams. The State had contested the admission of any testimony from Williams based on recollections remembered through hypnosis. The trial court, ultimately, ruled that only that testimony which was independent of hypnosis would be admissible.
Williams testified, without objection, that she saw Mrs. Leverett on the day of the murder, first at the beauty parlor, and later at the shopping center where Mrs. Leverett's automobile was discovered after the murder. Williams stated that as she was backing out of a parking space in front of a drug store in the Cottage Hill Road Shopping Center, she saw Mrs. Leverett's automobile "parked way out in the parking lot." As she drove through the parking lot she saw Mrs. Leverett exiting the car. As Williams was attempting to further explain the details of what she had seen in the shopping center parking lot, the State objected and, with the trial court's permission, asked Williams about the basis for her testimony. Williams responded: "Well, this is what — Some of this is what I remember from being under hypnosis."
In the bench conference that followed, outside the presence of the jury, the trial court questioned the witness and concluded that she could distinguish between the information she remembered before the hypnosis and the information that she remembered only through hypnosis. The trial court permitted Williams to testify that she had seen Mrs. Leverett's automobile and Mrs. Leverett in the shopping center parking lot, but excluded testimony that she also had seen a man in a white shirt and a tie in the vicinity of Mrs. Leverett's automobile, apparently making gestures to Mrs. Leverett. Williams had told the trial court that this latter evidence was solely a product of hypnosis.
The appellant theorized at trial and now argues on appeal that the man Williams remembered through hypnosis was Hilton Robinson, the State's key witness against the appellant. He contends that the court should have permitted him to develop this theory for the jury, using Williams's hypnotically induced recollections. He argues that such recollections are generally admissible, that challenges concerning the reliability of this information should affect its weight and credibility, not its admissibility. He explains that had these hypnotically induced recollections not been excluded, he could have argued to the jury that Robinson, not the appellant, killed Mrs. Leverett.
The State argues, to the contrary, that hypnotically induced recollections are generally inadmissible. In particular, the State points out that the hypnotic evidence proffered by the appellant in this case was properly excluded because of appellant's failure to offer any evidence, whatsoever, to establish the reliability of Williams's hypnotically induced recollections.
Initially, we note that appellant's theory, that Williams saw Robinson in that parking lot with Mrs. Leverett on the day of the murder, is not substantiated by the record before us. Williams testified, out of the jury's presence, that, through hypnosis, she remembered seeing a man with Mrs. Leverett, but that she could not identify him. Furthermore, even if we accepted this theory, we are not convinced that the evidence placing Robinson with the victim on the afternoon of the murder would have either incriminated Robinson or exculpated the appellant, absent some other independent, corroborative evidence.
In any event, we are convinced that, under the circumstances, the trial court was justified in excluding Williams's hypnotically-induced recollections.
The appellant failed to establish that hypnotically induced recollections meet the "reliability" requirements for general admissibility. In appropriate cases, Alabama follows the rule in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), for safeguarding "against admission into evidence of facts gleaned from an unreliable scientific test." Ex parte Dolvin,391 So.2d 677 (Ala. 1980); see, Wilcutt v. State, 41 Ala. App. 25,123 So.2d 193, cert. denied, 271 Ala. 315, 123 So.2d 203 (1960);Flurry v. State, 52 Ala. App. 64, 289 So.2d 632 (1973), *Page 302 
cert. denied, 292 Ala. 720, 289 So.2d 644 (1974); Wynn v.State, 423 So.2d 294 (Ala.Crim.App. 1982). In order to satisfy the Frye test for general admissibility, a scientific principle or discovery, or evidence produced therefrom, "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. UnitedStates, supra.
The applicability of the Frye test to hypnotically induced recollections is an issue of first impression in Alabama. However, the Frye test has been applied, analogously, to lie detector test results and it has clearly been determined that lie detector tests have not yet gained the required general acceptance for admissibility. See Ex parte Dolvin, supra; Wynnv. State, supra, and cases therein cited. On the other hand, the Dolvin court held that the Frye test was inapplicable to the forensic odontology test therein challenged, because the forensic odontology test is a physical comparison rather than a scientific test or experiment.
Nevertheless, we are convinced that the Frye test is applicable to hypnotically induced recollections. Hypnotic evidence may not be the same kind of physical evidence produced by mechanical testing, as with a lie detector, but it is evidence "developed by" or "based upon" novel scientific techniques, the type evidence with which the Frye test is normally associated. See, People v. Shirley, 31 Cal.3d 18,181 Cal.Rptr. 243, 641 P.2d 775 (Cal. 1982), cert. denied,458 U.S. 1125, 103 S.Ct. 13, 73 L.Ed.2d 1400 (1982); State v. Collins,296 Md. 670, 464 A.2d 1028 (1983). In short, hypnotically induced recollections, unlike forensic odontology comparisons, must be considered as scientific results, and must be judged by the same admissibility test (the Frye test) as similar scientific results. See, People v. Hughes, 59 N.Y.2d 523,466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); People v. Gonzales,415 Mich. 615, 329 N.W.2d 743 (1982). The similarity between hypnosis and lie detector tests was recognized in Wilcutt v.State, supra, wherein the court stated:
 "In Jones on Evidence, Sec. 436 p. 829 it is said: `Truth tests by lie detectors, truth serum, hypnosis
and the like are very generally rejected by the courts, usually on the ground that there is no general scientific recognition of their efficacy.'" (Emphasis supplied.)
The appellant, as the proponent of the hypnotically induced recollections in the instant case, had the burden of demonstrating compliance with the Frye test. People v. Shirley, supra; People v. Hughes, supra. This he failed to do. He presented no evidence, whatsoever, as to the reliability of hypnotically induced recollections or the general acceptability of such evidence by the scientific community. In the absence of any such proof of compliance with Frye, the trial court's exclusion of Williams's hypnotically induced recollections was not improper.
Moreover, the appellant failed to lay a basic predicate for the admission of these particular hypnotically induced recollections. The results of scientific examinations, tests, or experiments which have been established as reliable, e.g., blood-grouping tests, fingerprint comparisons, and ballistics tests, "are admissible, provided a proper foundation is laid."Chatom v. State, 348 So.2d 838 (Ala. 1977); see, Whetstone v.State, 407 So.2d 854 (Ala.Crim.App. 1981), and authorities therein cited; Moore v. State, 442 So.2d 164 (Ala.Crim.App. 1983); see also, Coleman v. State, 423 So.2d 276 (Ala.Crim.App. 1982). In holding that "atomic absorption test" results are generally admissible, the Chatom court stated that "we do not mean . . . that every atomic absorption test is admissible." The court explained that the trial court must be satisfied with the competency of the operator and the methods used. The court, nevertheless, held that the predicate established in Chatom, although very limited, was sufficient to support the trial court's decision to admit those specific atomic absorption test results.
In Whetstone the court explained that the proponent of scientific test results has an extensive burden to lay a basic predicate *Page 303 
for their admission to insure the reliability of those specific results. The court stated that "[i]n order for the test results to be reliable, and thus relevant to the matter at issue, the results must be from generally accepted tests conducted underconditions which do not impeach the reliability of the testingprocedure." (Emphasis supplied.)
In the instant case the appellant made no attempt, whatsoever, to lay a predicate for the admissibility of Williams's hypnotically induced recollections, even after the trial court had conditionally excluded the evidence "pending proof of reliability." Consequently, the record is silent with respect to the circumstances surrounding the hypnotic session(s) involved in this case. The record does not disclose the nature of the pre-hypnosis interrogations of Williams, the identity or the qualifications of the hypnotist, the hypnotic technique or procedure used, the nature and extent of hypnotic suggestions, or the nature and extent of any "safeguards" taken to enhance the reliability of the information obtained. Therefore, the trial court would have been justified in excluding these particular hypnotically induced recollections, even if the appellant had established general compliance withFrye.
Because the appellant did not satisfy his burdens of proof, we must conclude that the trial court's actions in this instance were proper. From the evidence presented at trial, we cannot and need not determine whether or not hypnotically induced recollections generally satisfy the Frye test, or whether or not Williams's specific recollections might have been admissible in this case.
As noted above, the general admissibility of hypnotically induced recollections is an issue of first impression in Alabama. However, this issue has been extensively litigated in other jurisdictions and has recently been the subject of many detailed and well-reasoned appellate court decisions. See, e.g., United States v. Charles, 561 F. Supp. 694 (S.D.Tex. 1983); People v. Shirley, supra; Brown v. State, 426 So.2d 76
(Fla.Dis.Ct.App. 1983); Key v. State, 430 So.2d 909
(Fla.Dist.Ct.App. 1983); Crum v. State, 433 So.2d 1384
(Fla.Dist.Ct.App. 1983); State v. Wren, 425 So.2d 756 (La. 1983); State v. Collins, supra; People v. Gonzales, supra;People v. Hughes, supra; Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170 (1981).
Through similar analyses these other courts have reached a variety of conclusions as to the admissibility of hypnotically induced recollections as a matter of law. The courts in Key andCrum, for instance, concluded that such evidence is generally admissible with "reliability" disputes affecting only its weight and credibility. The courts in Gonzales and Shirley, on the other hand, decided that such evidence, and any other related evidence from the same witness, is generally inadmissible due to the unproven reliability of recall induced through hypnosis. The rules espoused by the other courts seem to fall somewhere between these two extremes.
The court in People v. Gonzales, supra, adequately summarized the currently recognized shortcomings of hypnotically induced recollections as follows:
 "The hypnotic state is a condition of altered consciousness marked by heightened suggestibility. A subject in a hypnotic state may not have accurate recall. A hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended. Such suggestion may be transmitted either during the hypnotic session or before it by such persons as, in this case, the policemen investigating the killing. The person under hypnosis experiences a compelling desire to please either the hypnotist or others who have asked the person hypnotized to remember or who have urged that it is important that he or she remember certain events. The subject may produce the particular responses he believes are expected of him. In this state of hypersuggestibility and hypercompliance the subject will unconsciously create answers to the questions which the hypnotist asks if he cannot recount the details *Page 304 
being sought. This process of filling the gaps of memory with fantasy is called confabulation. Neither the person hypnotized nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. Finally, a witness who is uncertain of his recollections before being hypnotized will become convinced through the process that the story he told under hypnosis is true and correct in every respect. This effect not only persists, but the witness's conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story." (Footnotes omitted.)
These observations are generally accepted by all courts which have specifically addressed this issue. Those courts which have generally admitted, into evidence, hypnotically-induced recollections, e.g., Key v. State, supra, and Crum v. State, supra, have done so pursuant to the theory that the recognized reliability problems should affect only the weight and credibility of such evidence, not its admissibility.
Other courts have focused on the suggestions and confabulation associated with hypnotically induced recollections, Gonzales, supra, and Shirley, supra, and have held inadmissible not only the hypnotically-induced recollections, but also any pre-hypnosis recollections by the same witness on the same subject. The Gonzales and Shirley
courts theorize that a person is irreversibly "tainted" by hypnosis and should be considered unavailable as a witness on that subject.
The courts in United States v. Charles, supra, and Brown v.State, supra, favor a case by case admissibility determination, with hypnotically induced recollections being admissible "under appropriate circumstances."
The emerging trend appears to be a rule which prohibits the admission of hypnotically induced recollections (at least until such time as they are proven to be in compliance with the Frye
test), but permits pre-hypnosis evidence from that same witness on the same subject. See, People v. Hughes, supra, and State v.Collins, supra. The Hughes court explained that the "suggestive" nature of hypnosis is not unlike other "impermissibly suggestive pre-trial identification procedures," which might "taint" other evidence. That court, as doesCollins, recommends that pre-hypnosis testimony be admitted, provided the proponent proves, to the satisfaction of the trial court, the reliability of such evidence. See, People v.Perrino, 466 N.Y.S.2d 408, 96 A.D.2d 952 (1983); State v.Metscher, 297 Md. 368, 464 A.2d 1052 (1983); Simkus v. State,296 Md. 718, 464 A.2d 1055 (1983); Grimes v. State, 297 Md. 1,464 A.2d 1065 (1983) (cases applying the rule of Hughes andCollins.)
In spite of the persuasive analyses in Hughes and Collins we are not prepared, at this writing, to hold that hypnotically induced recollections are inadmissible in Alabama, as a matterof law. However, neither are we compelled to find such evidence generally admissible. The appellant has failed to provide us with any proof that such evidence satisfies the Frye test, or that Williams's hypnotically induced recollections, in particular, were generated under circumstances that insured their reliability. Consequently, resolution of this issue must await a more appropriate case, where the issue has been fully litigated and properly presented to us. See, Commonwealth v.Nazarovitch, supra; Commonwealth v. McCabe, 303 Pa. Super. 245,449 A.2d 670 (1981).
We do, however, acknowledge the efficacy of hypnosis as an investigatory tool. We caution those who so use it to properly document pre-hypnosis evidence to insure its admissibility in appropriate cases, to refute claims that it is somehow "tainted" by hypnosis. We also caution the proponents of hypnotic evidence to take every possible precaution to assure its reliability.
The appellant argues that the State, in effect, destroyed evidence by hypnotizing Williams, thereby preventing the appellant from refreshing her memory by acceptable methods. This argument has a logical premise, but is not supported by the record. For aught that appears, Williams *Page 305 
was originally thought to be a key witness in the State's investigation of Mrs. Leverett's murder, and hypnosis was resorted to only after every reasonable effort was made to refresh her memory using traditional memory refreshing methods. Williams more or less confirmed this at trial. She submitted to hypnosis voluntarily and clearly remembered those recollections which were solely the product of that hypnosis. Moreover, she did testify as to everything she remembered independently from hypnosis. She also stated that she had no present recollection of the information induced through hypnosis, but rather remembered that information only due to post-hypnotic suggestions. She could not independently confirm the fact that she saw someone with Mrs. Leverett in the parking lot, and the appellant presented no other evidence to corroborate this fact.
Considering the circumstances, we cannot say that the State's actions in this regard were improper.
For the reasons herein stated, appellant's capital murder conviction and his sentence to life imprisonment without parole are due to be and are, hereby, affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, P.J., who concurs in the result only.