The appellant, Charles Gregory Smith, was convicted of driving while under the influence of alcohol, a violation of § 32-5A-191, Code of Alabama 1975, driving while his license was revoked, a violation of § 32-6-19, Code of Alabama 1975, and driving with improper lights, a violation of § 32-5-240, Code of Alabama 1975. He was sentenced to 60 days' imprisonment in the City of Tuscaloosa Jail and was fined $1,000 for the driving under the influence conviction. He was fined $100 and $20, respectively, for the offenses of driving while his license was revoked and driving with improper lights.
The city's evidence tended to show that on Sunday, December 19, 1993, at approximately 2:30 a.m., the appellant, while under the influence of alcohol, was driving an automobile on a city street in Tuscaloosa, Alabama.
In the early morning hours of December 19, off-duty Tuscaloosa Police Officer Clint Davis was working as a security guard at the Bama Beach Club, a bar, located on a section of University Boulevard in Tuscaloosa adjacent to the University of Alabama that is commonly referred to as "the Strip." Davis saw the appellant park his black pickup truck in a parking lot across the street from the Bama Beach Club. Davis noticed that the appellant ran over the curb when he parked. Davis then saw the appellant go to several bars on "the Strip"; however, all the bars had closed because it was after 2:00 a.m. on Sunday morning.
The appellant attempted to open the locked doors of the Bama Beach Club, and Davis told him that all the bars were closed. Davis noticed that the appellant's eyes were swollen and that he was staggering when he walked. Davis thought that the appellant appeared to be too intoxicated to drive. Davis attempted to stop the appellant before he returned to his truck, but Davis was unable to do so. Davis testified that the *Page 103 
appellant "left out burning rubber, squealing tires, smoking tires." Davis testified that the headlights of the appellant's truck were not on when the appellant left the parking lot and turned onto University Boulevard.
Davis radioed police headquarters and reported the appellant. Although no Tuscaloosa police officers were in the immediate area, University Police Officer David Michael Whitney was nearby and responded to the call.
Whitney saw the appellant's black pickup truck, without its headlights on, traveling on University Boulevard. Whitney turned on his blue lights, and, after traveling another 200-300 yards, the appellant pulled his truck to the side of the road. Whitney approached the appellant's truck and asked the appellant for his driver's license. At that time, Whitney smelled the odor of alcohol. Tuscaloosa Police Officer Drake Jones then arrived at the scene, and Whitney turned the investigation over to him.
Jones also detected a strong odor of alcohol on the appellant's breath. Jones believed that the appellant was intoxicated and had the appellant perform three field sobriety tests: the "one-leg stand test," the "walk-and-turn test," and the "finger-count test." The appellant was unable to successfully perform any of these tests. Jones also testified that the appellant's speech was slow and slurred and that the appellant's eyes were red. Jones concluded that the appellant was under the influence of alcohol and arrested him for driving under the influence of alcohol. The appellant, however, refused to submit to the Intoxilyzer 5000 breath test.
The city also presented evidence that at some time before December 19, 1993, the appellant's driver's license had been revoked and that it was still revoked on December 19.
 I
The appellant contends that the court erred in refusing to grant his motion for a judgment of acquittal. Specifically, he contends that the city did not present sufficient evidence of his intoxication. He argues that the only evidence of his intoxication was the testimony of Officer Jones and Officer Whitney that they detected the odor of alcohol coming from the appellant. This, however, is not true.
Officer Jones testified in detail concerning the appellant's performance on each field sobriety test. The appellant's performance on these tests indicated that he was impaired. Additionally, both Officer Jones and Officer Davis testified that the appellant's appearance and demeanor indicated that he was intoxicated.
When reviewing a claim relating to the sufficiency of the evidence, we must view the evidence presented in the light most favorable to the prosecution and afford the prosecution all legitimate inferences therefrom. Owens v. State, 597 So.2d 734
(Ala.Cr.App. 1992). There was sufficient evidence presented by the city to support the appellant's conviction for driving under the influence of alcohol.
 II
The appellant contends that the court erred in allowing Officer Drake Jones to testify as an expert concerning the appellant's performance on the field sobriety tests. A review of the trial transcript reveals that Officer Jones did not testify as an expert as to the results of the tests but rather described the appellant's performance on the tests. "[F]ield sobriety tests . . . are practical field tests administered by lay people, not novel scientific tests that, under Frye v.United States, 293 F. 1013 (D.C. Cir. 1923), and Prewitt v.State, 460 So.2d 296 (Ala.Cr.App. 1984), require experts to testify as to their reliability and general acceptance in the scientific community." Scott v. State, 624 So.2d 230, 232
(Ala.Cr.App. 1993).
 "Field sobriety tests 'monitor whether the subject's coordination has been impaired by the consumption of alcohol.' Seewar v. Town of Summerdale, 601 So.2d 198, 200 (Ala.Cr.App. 1992).
 " 'These tests are intended to determine the suspect's balance, coordination, and/or mental agility, all factors notably impaired by intoxication. The walk-the-line test, for example, is intended to gauge the individual's balance, as are the *Page 104 
modified-position-of-attention and leg-raise tests; the finger-to-nose is perhaps the most common of the coordination examinations; and alphabet recitation and reverse counting are indicative of attempts to test mental agility.'
 "R. Jensen, et al., Advanced Drinking/Driving Litigation in Alabama § II, at 126 (1986)."
Scott, 624 So.2d at 232.
The court did not err in receiving Officer Jones's testimony into evidence. Officer Jones's testimony was based upon his observations and was not presented as expert testimony.
 III
The appellant also contends that the court erred in instructing the jury that driving while one's license is revoked and driving with improper lights are "strict liability crimes" and, therefore, that these offenses do not require a culpable mental state.
Section 13A-2-3, Code of Alabama 1975, provides:
 "The minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing. If that conduct is all that is required for commission of a particular offense, or if an offense or some material element thereof does not require a culpable mental state on the part of the actor, the offense is one of 'strict liability.' If a culpable mental state on the part of the actor is required with respect to any material element of an offense, the offense is one of 'mental culpability.' "
Section 13A-2-4(b), Code of Alabama 1975, further provides:
 "(b) Although no culpable mental state is expressly designated in a statute defining an offense, an appropriate culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability."
Although § 32-6-19, Code of Alabama 1975, defining the offense of driving while one's license is revoked, and §32-5-240, Code of Alabama 1975, defining the offense of driving with improper lights, do not provide for the element of intent, these offenses fall within a category of strict liability offenses commonly called "public welfare offenses."
 "[Public welfare offenses] do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving." *Page 105 
Morissette v. United States, 342 U.S. 246, 255-56,72 S.Ct. 240, 246, 96 L.Ed. 288, 296-97 (1952).
 "It is undisputed that the State may enact laws for the public health and safety imposing strict liabilities without any element of scienter. Smith v. State, [223 Ala. 346, 136 So. 270 (1931)]; Allen v. State, [33 Ala. App. 70, 30 So.2d 479
(1947)]; e.g., United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). However, the legislative power to impose criminal sanctions to any conduct is restrained by the constitutional command that no person can be 'deprived of life, liberty, or property, except by due process of law'. Article I, § 6, Alabama Constitution of 1901; see Smith v. People, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205
(1959).
 "It has become common to impose strict criminal liability in connection with a variety of regulatory statutes for violation of what are commonly called 'public welfare offenses.' Perkins, Criminal Law, 2d Ed., Ch. 7, Strict Liability (1969); Hall, General Principles of Criminal Law, 2d Ed., Ch. 10, Strict Liability (1960). The regulatory statutes encompass such fields as:
 " '. . . (1) illegal sales of liquor; (2) sales of impure food or drugs; (3) sales of misbranded articles; (4) criminal nuisance; (5) traffic regulations; (6) motor vehicle laws; and (7) violations of general regulations, passed for the safety, health or wellbeing of the community.' Perkins, supra, at 802.
 "Although it may be difficult to ascertain common features in the public welfare offenses, one author has made the following generalizations:
 " '. . . First, many of the enactments apply not to the general public but only to certain traders, particularly to suppliers of food or drugs and vendors of alcoholic beverages. Others, having more general application as to potential offenders, are restricted to very few activities — the operation of automobiles, safety of highways, hunting, fishing, and various health measures. Next, many of these regulations and the conditions of conforming to them presuppose a continuous activity, such as carrying on a business. . . . Third, the public welfare enactments are relatively new. They represent relatively recent adaptations to an intricate economy, including an impersonal market. . . . [F]ourth, the modern regulations are not strongly supported by the mores. Their occurrence does not arouse the resentment directed as the perpetrators of traditional crimes. . . . The above common attributes of large segments of the minor offenses which are subjected to strict liability indicate that this law was constructed to meet new, important social problems. . . .' Hall, General Principles of Criminal Law, 2d Ed., supra, at 330-331."
Walker v. State, 356 So.2d 672, 673 (Ala. 1977). (Emphasis added.)
 " 'Generally speaking, when an act is prohibited and made punishable by statute only, the statute is to be construed in the light of the common law and the existence of a criminal intent is to be regarded as essential, even when in terms not required. The Legislature, however, may forbid the doing of an act and make its commission criminal without regard to the intent or knowledge of the doer, and, if such legislative intention appears, the courts must give it effect, although the intent of the doer may have been innocent. This rule has been generally, though not quite universally, applied to the enforcement of statutes passed in aid of the police power of the state where the word "knowingly" or other apt words are not employed to indicate that knowledge is an essential element of the crime charged. The doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted and knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt.' Smith v. State, 223 Ala. 346, 347, 136 So. 270 (1931). *Page 106 
 "Generally see, Walker v. State, 356 So.2d 672
(Ala. 1977); LaFave and Scott, Handbook on Criminal Law, Section 31 (1972); Perkins, Criminal Law
812-815 (2nd ed. 1969); Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55, 84-88 (1933).
 " 'A statute may simply provide that whoever does (or omits to do) so-and-so, or whoever brings about such-and-such a result, is guilty of a crime, setting forth the punishment. . . . Often this statutory crime has been created in order to help the prosecution cope with a situation wherein intention, knowledge, recklessness or negligence is hard to prove, making convictions difficult to obtain unless the fault element is omitted.' LaFave at 218.
 "Clearly the legislature may make the commission or omission of certain conduct a criminal offense without regard to the intent of the actor. Haywood v. State, 280 Ala. 171, 190 So.2d 728
(1966) (Being on a public road while under the influence of liquor or drugs); Smith, supra (Giving false weights and measures in the sale of gasoline); State v. Southern Express Co., 200 Ala. 31, 75 So. 343 (1917) (Transporting prohibited liquor); McKinney v. State, 50 Ala. App. 271, 278 So.2d 719, cert. denied, 291 Ala. 789, 278 So.2d 724 (1973) (Assault with deadly weapon upon police officer); Dixon v. State, 40 Ala. App. 465, 115 So.2d 262 [(1957)], cert. granted, 269 Ala. 593, 115 So.2d 269 (1958) (Possession of a still); Leonard v. State, 38 Ala. App. 138, 79 So.2d 803, cert. denied, 262 Ala. 702, 79 So.2d 808 (1955) (Overweight truck); Fiorella v. City of Birmingham, 35 Ala. App. 384, 48 So.2d 761, cert. denied, 254 Ala. 515, 48 So.2d 768 (1950) (Possession of lottery tickets); City of Birmingham v. Reed, 35 Ala. App. 31, 44 So.2d 607 (1949) (Possession of lottery tickets). . . ."
State v. Spurlock, 393 So.2d 1052, 1057-58 (Ala.Cr.App. 1981).
Because the offenses of driving while one's license is revoked and driving with improper lights are "public welfare offenses," the court correctly instructed the jury that the appellant's mental culpability was not an element of the offense that the city had to prove. Walker; Spurlock.
For the foregoing reasons, the appellant's convictions are due to be affirmed.
AFFIRMED.
All the Judges concur.